## Case No. 11,010.

### PERRY et al. v. PARKER et al.

[1 Woodb. & M. 280.] [1]

Circuit Court, D. Massachusetts. May Term, 1846.

INJUNCTION — DENIAL OF COMPLAINANT'S TITLE— MERGER—MILL PRIVILEGES—CONVEYANCE OF DIFFERENT RIGHTS.

1. Injunctions cannot be granted in the courts of the United States without notice, and hence all of them here are special. If the title of the complainant is denied, he must show former recoveries, or long possession, in the case of patents; and in case of waste and trespass, that there are no facts to warrant the denial, or the injunction will be refused till the disputed questions of title are settled at law.

[Cited in Woodworth v. Rogers, Case No. 18,-018; Irwin v. Dixion, 9 How. (50 U. S.) 29; U. S. v. Parrott, Case No. 15,998; Le Roy v. Wright, Id. 8,273; Earth Closet Co. v. Fenner, Id. 4,249; Cook v. Ernest, Id. 3,155.]

[Cited in Clayton v. Shoemaker, 67 Md. 219, 9 Atl. 636; Ashurst v. McKenzie (Ala.) 9 South. 264.]

2. Where an estate, out of which a mill privilege has been carved, becomes united in ownership with other estates below, the owner of both may convey different rights and privileges from what were before attached to either estate: but in conveying either to different and new persons, any change in the privileges made appurtenant to each must distinctly appear, or each will be presumed to exist as before the junction of the estates.

[Cited in U. S. v. Parrott, Case No. 15,998.]

[Cited in Dunklee v. Wilton R. Co., 24 N. H. 501.]

This was a bill in equity [by William Perry and others, against Betsy Parker and others] praying an injunction against the respondents not to cut down the dam and gates of the complainants, on Johnson's brook, in Bradford, in this state. It was averred that this dam and gates were used in connection with, and to retain water for, mills and machinery for spinning flax, situated at another dam several rods below, and which machinery was of great value; that they had been used for this and other purposes by the complainants, and those under whom they claim, undisturbed, for sixty years, till the respondents, in February last, destroyed a portion of them, and threatened to persist in cutting them away, greatly to the injury of the complainants; against which a special injunction is prayed for forthwith. Various other matters in connection with these general averments were detailed in the bill, and will be referred to in the opinion of the court, so far as important to the point on which the subject is disposed of for the present. The respondents, on being notified pursuant to law, appeared and resisted the prayer. But the rule for an answer not having expired, none had been filed; and the hearing came on under affidavits filed upon both sides, and a long series of title deeds, and wills, and proceedings in partition in the probate courts

[1] [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]

in the county of Essex. Such of these as it may be necessary to particularize will be stated by the court, with any admissions or agreements by the parties as to facts deemed material, and not in controversy between them.

B. Rand, for complainants.

Mr. Choate and O. P. Lord, for respondents.

WOODBURY, Circuit Justice. Injunctions being prohibited in the courts of the United States, by an act of congress, without notice first to the opposing party (Act 2d March, 1793, c. 22, § 5 [1 Stat. 334]), it follows that all of them must here be regarded as special, rather than some of them as common, or a matter of course (Drew. Inj. 5; 2 Story, Eq. Pl. 177); and therefore, when resisted under such notice, whether the hearing comes on before or after an answer, no injunction can be granted, unless special and sufficient cause is clearly shown. Thus, by way of illustration, if the complainant asks for an injunction against the use of a patent, he must not only show a patent in his favor, valid on its face, and raising a presumptive title in him to its exclusive use; but, if the respondent denies his title, and casts a shade over it by evidence, the grant of the injunction must be delayed, till the validity of the title can be tried under a proper issue in the case, unless the complainant can strengthen his claim beyond the mere patent, by showing former recoveries in favor of it, or quiet possession of it for some time, or frequent sales and uses of it under him. So in cases of injunction against waste or trespasses, it is not only necessary for the complainant to make out a prima facie title to the premises or property, but if his title, to the extent to which it is set up by him, is denied and contested by the respondent, and evidence enough is offered to show there is some ground, in the facts of the case, for this denial, the court will not grant the injunction till the disputed title is first settled between the parties, on appropriate pleadings and full testimony.

In the present case, there have been no such pleadings and the title, as set up by the complainants, and as proved prima facie, is contested by the respondents. The grant of an injunction, then, must be postponed, under the well established rule I have just referred to, until a suitable issue is framed and tried in respect to the title, provided the respondents have introduced sufficient evidence, not to overturn the plaintiff's title, or to establish their own, (for these are the very questions hereafter to be tried,) but to show that they have some plausible and real grounds for bringing the title in question. The reason of this distinction will be apparent and strong, when it is seen that the extraordinary intervention of a court of equity in issuing an injunction against doing acts concerning so grave and weighty a subject as real estate, can never be proper unless it is clear that the person doing them has no title to the property. Otherwise the true owner might be excluded from the free and lawful use of his own estate. While any reasonable doubt exists on the subject of the title, neither party stands in a position to invoke any extraordinary interference of a court of equity in his behalf, but can and should resort to the courts of law for redress for supposed injuries; or by actions there, or in other modes in equity, first settle the title which is in dispute. On the contrary, likewise, it is equally reasonable not to permit a respondent to deprive a complainant of the remedy in equity by an injunction in a case where irreparable and repeated injuries are anticipated, and where no other form of redress is so speedy and effectual, merely by making a formal denial of the plaintiff's title, without any evidence to show the denial to be made probably in good faith, and to be sustained by something of fact and law.

The cases generally, where an injunction is allowed in connection with the realty, are those in which the interests of the parties in the estate are admitted, but the controversy is concerning what they may do under these interests, and where one may do under color of his interests much more than he is clearly entitled to. Drew. 182; 1 Mylne & C. 516. As, for instance, one being proved or conceded to own a life estate, and the other the reversion, the contest is, what are their rights as to cutting timber; or certain kinds of trees, such as saplings, or mere ornaments; or one being a mortgagor and the other a mortgagee; or one being a tenant in common with the other; or one a contiguous owner, and a contest arising as to the use of water, mines, &c., which each claims. But it seems well settled that if the estate each is entitled to in the premises is not admitted or clear, no injunction will issue till it is made clear by a trial. Drew. Inj. 182, 238; Weller v. Smeaton, 1 Brown, Ch. Append. 572; Chalk v. Wyatt, 3 Mer. 688; Duvall v. Waters, 1 Bland, 569, 585; 1 Ves. Jr. 140, note; 6 Ves. 110; 3 Atk. 496. And this trial will not be on affidavits, but on proper pleadings and process. 1 Am. Ry. Cas. 120. Some cases go so far as to hold it should not issue at first, if the respondent merely denies the title of the plaintiff. Drew. 186, 187; Kinder v. Jones, 17 Ves. 110; Smith v. Collyer, 8 Ves. 89; Hanson v. Gardiner, 7 Ves. 305; Norway v. Rowe, 19 Ves. 144. Some cases of necessity, where the danger is great and the injury irreparable, may in England be regarded as exceptions. Gibson v. Smith, 2 Atk. 182; Davis v. Leo, 6 Ves. 784; 2 Ves. Sr. 453; 3 Mer. 687. And I am inclined to hold that a mere denial of title is never sufficient, as such denial may be made for delay and mischief, unless accompanied, as before remarked, by circumstances showing it to be made in good faith. Johnson v. Gere, 2 Johns. Ch. 546.

Again, if it should turn out on trial, that each is entitled as a tenant in common for however small a share in the property alleged to be injured, though other co-tenants may dissent, such an owner, if doing damage, cannot usually be restrained by an injunction. Drew. Inj. 162; 7 Ves. 589. But extreme abuses may exist there which may justify an interference. 16 Ves. 128. The title of the plaintiffs, then, as set up to the upper dams exclusive of any in the defendants, being controverted, it becomes necessary to ascertain whether that is done without any apparent cause and justification, or with so much in its support as to make it proper, before proceeding further on the present application, to require the parties to have the nature and extent of their interests in those upper dams decided by a full and formal trial of it.

The stream, called Johnson's brook, across which the dams are erected, that the respondents have cut away in part and threaten to continue to do, is fed by water from three small natural ponds, not far distant. On that stream, descending from the last pond, and below these two dams, is another across the brook, at which the mills and machinery of the plaintiffs are situated, and below that is another, at which mills and machinery are situated, in which the defendants claim an interest, in common with some third persons. The two dams, which are nearest to the pond, and at which, it is admitted, there is no machinery, and which the defendants have in part cut away, are made to detain more water in the ponds while there is a great abundance in the spring, which otherwise would run to waste; and to use it in the summer, when, without retaining it in this manner, the supply at all the mills below would be very insufficient for their wants. Those two dams nearest the pond are not far from the sites of two very ancient ones, which it is conceded, have probably been used for this purpose, portions of the year at least, from the first erection of mills on that stream, quite a century ago.

The plaintiffs contend, that as respects the lowest mills, occupied by the defendants and others, they have an exclusive right to keep up and regulate the two upper dams; and that, in doing this, as has been practised by them, the defendants are benefitted rather than injured. This is conceded by some who own the lower mills in common with the defendants, but not by the defendants themselves, as they, on the contrary, set up an interest in common with the plaintiffs in the two upper dams, and allege that as the water is used by the plaintiffs, the bark-mill and saw-mill, in which the defendants are interested, are seriously injured, because the local right of the owners of those mills to the water at all at the lower dam extends only to the surplus not used by the grist-mill there; and hence when the water does not come down in large quantities, the whole of it is used by

the grist-mill, and their other establishments become almost worthless. In cutting the gates of two upper dams, therefore, they aver that it has been done only when the plaintiffs have refused to let the water flow down in quantities sufficiently large for the use of the bark and saw-mill of the defendants; and also in those quantities in alternate weeks, such as have long been customary, and as they have a right by deed in the upper dams and water above them, to permit equitably as well as legally, since they own half, and but one half, of the interests in them. Let us look, then, a moment to the state and origin of the conflicting title by deed and wills between the parties to the upper dams, and the use of the water above them. In order to understand it, it will be necessary to notice, that before the erection of the mills and dam of the plaintiffs or the defendants, and early as 1737, one Thomas Carlton owned a fulling-mill, and had a dam for it a few rods above the mills of the plaintiffs, and below the two dams in dispute. That about 1772, he devised them to his sons Daniel and Thomas; that Thomas, the second, released his interest therein to Daniel, in 1786, and Daniel, in 1788, conveyed his to Retire H. Parker, Thomas, the second, having also made another release, from abundant caution, of his interest to the same Parker. In all these conveyances was included, also, one half of the stream and dams above, which are now in controversy.

At this time, it is to be remembered, that this same Retire H. Parker was also owner of one half of the lowest grist-mill and a part of the saw-mill, where the defendants now own and occupy, having obtained the same by deed from Eliphalet Hardy, in 1782; while one Joseph Kimball owned the other half, derived through conveyances from the same E. Hardy. Retire H. Parker, while thus owner of a part of the lowest mills and of the fulling-mill site and dam above, both having gone to ruin and continued so till this time, and of half the stream and dams above the fulling-mill which had been conveyed to his grantors, died. And, in 1801, a committee, appointed by the court of probate, set off to Aaron Parker, his son and heir, his interest in the grist-mill at the lowest dams, with a privilege in all the dams above owned by his father, and to draw water from them, as described in Hardy's deed, and in those of Daniel and Thomas Carlton. They set off the privilege to erect a saw-mill at the fulling-mill site to another son.

Aaron Parker occupied the premises till his death, in 1831. Before his death, and as early as 1814, another change in the estates in controversy had occurred, and made him interested in the whole of them. Because, in that year he purchased the land and grist-mill and dam, where the plaintiffs' mill now are, with all the privileges to the stream of water and dams above, which belonged to the estate of Phineas Carlton. And it fur-

ther appeared, that by sundry new conveyances from Phineas Carlton, since 1766, there had come to him what Phineas Carlton then owned, which was, the corn and grist-mill, and half the saw-mill, then at the place now occupied and owned by the plaintiffs, and half the upper dams and half the stream above. Aaron Parker's estate, then, in 1831, thus embracing a large part of the mills and dam lowest down, where the defendants occupy, and all the mills and dam where the plaintiffs occupy, and all the dams and stream above, was devised and set off in the court of probate, in several lots or shares, one of which was to Betsy Parker, a respondent, for her life, half the grist-mill at the lowest site, with privilege in all the dams above that belonged to Retire H. Parker, and as described in D. Carlton's and Hardy's deeds.

The Woodmans, respondents, claim an interest in the lower premises, as entitled to the reversionary estate after Betsy Parker's death, and by other conveyances of parts of the other mills at the lowest sites. Another lot or share was set off to Elizabeth Dow, a daughter of Aaron Parker, and included the mills and dam at the place occupied by the plaintiffs, with all the privilege of the stream and dams above that belonged to Phineas Carlton. Thus, it will be seen that, in 1831, the privileges now in controversy, however owned or occupied before, had all become merged or collected in certain portions, or in full, in Aaron Parker, and were carved out among his heirs.

Were they so divided anew as to alter the titles as standing previously? There is little pretence, that by any paper title now in evidence, the owners of the lowest mills, till Retire H. Parker's purchase in 1788, had any interest in the dams or stream above the fulling-mill site. While it is very certain, by the paper title, that those owning the mills and dam now occupied by the plaintiffs, had enjoyed a title to one half of the dams and stream above the fulling-mill site, ever since 1766. But in 1788, Retire H. Parker, one of the owners of the lowest site, became entitled to all the fulling-mill and half the dam and stream above, and the first question on the paper titles would be, if that purchase would enable him to use the dams and stream above, except in connection with, and for the use of, the fulling-mill and the privilege there. It was bought with that, and was appurtenant to it, and it is difficult to see how he could legally transfer it to a privilege far below, with that of the plaintiffs' intervening, and when the use of it in connection with a different site below might be very different from what it had been with the fulling-mill, or would be with new machinery there, and might very differently affect and injure the next rights below it belonging to the plaintiffs and their grantors. It would seem to be very questionable that without their consent, shown expressly or by long usage, Retire H. Parker and those claiming merely through him, could make such a transfer of the upper site and its appurtenances. But when the plaintiffs' site and both the others became all united in Aaron Parker in 1831, I do not see the same difficulty in the way of him or his heirs, if they desired to annex an interest in the use of the two upper dams to the lower privilege, if they thought proper.

If the estate, which has an easement in another, becomes united to the other, the easement is extinguished generally, not always. See cases of illustration, in Hazard v. Robinson [Case No. 6,281]. Quære, if by a subsequent grant, all does not pass which was then used with the principal thing passing. 3 Taunt. 24. Nor do I see the same ground to complain in their grantees who choose to take half of the upper privilege, where the plaintiffs occupy, with half the dams and stream above, after the other half has been attached to the mills and privilege lowest down, instead of being attached, as originally, to the fulling-mill and the privilege there alone. But whether the language of the partitions and deeds must on the face of them be construed as intending to transfer the use of half the upper dams and the stream to the lower privilege or not, I do not decide, and it is a little doubtful. It is a question of some nicety and difficulty, and is surely enough so to have it more fully examined and settled, before deciding finally on this application for an injunction on the hypothesis that none of the privileges at first enjoyed at the fulling-mill were intended to be transferred to the owners of the lowest works.

It is worthy of notice too, in connection with this, that in dividing Mr. Parker's estate, the privilege of using the dams and stream above is included in connection with the site below in one paragraph, and assigned together to one heir, and is valued or appraised in conjunction with it as one piece of property. All the different pieces of property, though assigned to one heir, are appraised separately; but these are appraised together, as if intended to be treated as one. Again, the site for a saw-mill above, where the fulling-mill stood, which Retire H. Parker owned, had been set off to another of his sons, and was not owned by Aaron nor set off to any body in his estate. So the evidence as to the manner of occupation and use of the water and dams above, by those owning at the lowest site, is in some respects contradictory, in others strongly in aid of the plaintiffs' views, and in others favorable to the defendants. Some of the evidence on one side can be reconciled, when we advert to the fact of some of the part owners of the lowest and upper site being at one period the same; and I do not find it necessary or expedient to decide on it now, or on the several questions as to the right to flow, under the Massachusetts statute for reservoirs, or to keep up the flash-boards of gates after a

certain period in the spring, or to take them down in alternate weeks without the assent of, or making any compensation to, the plaintiffs. All this must be done when or after the title is decided.

There is also some testimony in the case of occupation by the plaintiffs and their grantors of the soil or land connected with the fulling-mill privilege, and under which they claim a title to that privilege, and also to the use of the whole dam and water above, which were appurtenant to it. That evidence, as bearing on the title they now set up to dams above, as well as on the denial of it by the defendants, will have to be weighed with care, and, in connection with the various facts now or hereafter put in, as to the use of the dams and stream above by the defendants for the last thirty years, may control all the paper title, or at least furnish evidence of a cotemporaneous and continued construction of deeds and partitions, which may be decisive of the rights of the parties under this application. Let the prayer for the injunction, then, be postponed till the question of title between these parties is settled.